## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

**ERIC FORBUSH,**

*Plaintiff*

v.

**THE TRUSTEES OF THE UNIVERSITY OF PENNSYLVANIA, JOHN JACKSON JR., GUOBIN YANG, DAMON CENTOLA, SARAH BANET-WEISER**

*Defendants.*

CIVIL ACTION No.
_____
ELECTRONICALLY FILED

**JURY TRIAL DEMANDED**

**Date:** [2024-08-26]

## I. PRELIMINARY STATEMENT

1. This is a civil action for declaratory, injunctive, and monetary relief for violations of the constitutional and civil rights of the Plaintiff, Eric Forbush. The Plaintiff, a former doctoral student at the University of Pennsylvania's Annenberg School for Communication, brings this action against the Trustees of the University of Pennsylvania, John Jackson Jr., Guobin Yang, Damon Centola, and Sarah Banet-Weiser for engaging in conduct that deprived him of his rights under Title VI of the Civil Rights Act of 1964, Title IX of the Education Amendments of 1972, 42 U.S.C. § 1981, the Americans with Disabilities Act (ADA), 42 U.S.C. § 12182(b)(2)(A)(ii), 42 U.S.C. § 12182(b)(2)(A)(iii), 42 U.S.C. § 12203, Section 504 of the Rehabilitation Act, and Pennsylvania common law

claims for Intentional Infliction of Emotional Distress (IIED), Negligent Infliction of Emotional Distress (NIED), Breach of Contract, and Negligent Supervision.

2. The Trustees of the University of Pennsylvania, John Jackson Jr., Guobin Yang, Damon Centola, and Sarah Banet-Weiser engaged in actions that led to the Plaintiff's wrongful dismissal from the doctoral program. These actions included the failure to provide reasonable accommodations for documented disabilities and retaliation for protected activities under Title IX and other statutes.

3. Specifically, the Defendants manipulated exam outcomes, involved faculty members with conflicts of interest in the examination and dismissal process, and failed to provide reasonable accommodations as required under the ADA and Section 504 of the Rehabilitation Act. These actions deviated from established academic procedures and standards.

4. The Plaintiff sought recourse through the University's administrative processes, including formal appeals, grievances, and seeking intervention from the Ombuds Office. Despite presenting substantial evidence of procedural errors and retaliation, the Plaintiff's appeals and grievances were either ignored or inadequately addressed, necessitating this legal action.

5. The Plaintiff faced numerous administrative obstacles in obtaining necessary accommodations for his disabilities. Despite documented needs and prior accommodations (e.g., SATs and GREs), the Plaintiff was subjected to unreasonable demands for new evaluations during the height of the COVID-19 pandemic, which were impractical and unnecessary. The Defendants' actions demonstrate a persistent failure to provide reasonable accommodations as required by the ADA and Section 504 of the Rehabilitation Act.

6.  As a result of the Defendants' actions, the Plaintiff has suffered significant financial losses, including the cost of tuition, loss of earnings related to being deprived of a doctorate, and damage to his academic and personal reputation. The Plaintiff also experienced severe emotional distress, exacerbated by the Defendants' failure to accommodate his disabilities and their contradictory and unclear instructions regarding examination procedures.

7.  This action seeks to hold the Defendants accountable for their actions, to obtain relief for the harm the Plaintiff has suffered, and to ensure that similar misconduct does not occur in the future.

## II. JURISDICTION AND VENUE

8.  This Court has jurisdiction over this matter under 28 U.S.C. §§ 1331 and 1343 because the claims arise under the laws of the United States, including Title VI of the Civil Rights Act of 1964, Title IX of the Education Amendments of 1972, 42 U.S.C. § 1981, the Americans with Disabilities Act (ADA), and Section 504 of the Rehabilitation Act.

9.  This Court also has jurisdiction over this matter pursuant to 28 U.S.C. § 1332 because the amount in controversy exceeds $75,000 exclusive of interest and costs, and the action is between citizens of different states. The Plaintiff is a resident of Massachusetts while the Defendant is domiciled in Pennsylvania.

10. This Court has supplemental jurisdiction over the state law claims under 28 U.S.C. § 1367 because they are so related to the federal claims that they form part of the same case or controversy.

11. The venue is proper in this district under 28 U.S.C. § 1391 because the events giving rise to this action occurred in this district.

## III. PARTIES

12. **The Plaintiff, Eric Forbush,** is a former doctoral student at the University of Pennsylvania who currently resides at 248 Liberty Square Road, Boxborough, Massachusetts.

13. **The Defendants, The Trustees of the University of Pennsylvania,** is a private educational institution organized under the laws of Pennsylvania and located in Philadelphia, Pennsylvania. At all times relevant to this complaint, the University of Pennsylvania was and remains a recipient of federal funding, thereby subjecting it to Title VI regulations. As of June 30, 2023, the University of Pennsylvania's endowment fund amounted to $21 billion.

14. **Defendant John Jackson Jr.** is the current Provost of the University of Pennsylvania and the Richard Perry University Professor. At the time of the Plaintiff's removal, he was the Dean of the Annenberg School for Communication. In his capacity as Dean, he was responsible for overseeing the fairness and integrity of the academic evaluation process. His failure to intervene or review the committee's decisions, despite clear signs of bias and procedural misconduct, contributed to the wrongful actions taken against the Plaintiff. His principal place of business is the University of Pennsylvania, 3451 Walnut St, Philadelphia, PA 19104.

15. **Defendant Guobin Yang** is the Grace Lee Boggs Professor of Communication and Sociology, Director of the Center on Digital Culture and Society, and Deputy Director of the Center for the Study of Contemporary China at the University of Pennsylvania. He also serves as the Associate Dean for Graduate Studies at the Annenberg School for Communication. At the time of the Plaintiff's removal, he played a pivotal role in the biased handling of the Plaintiff's complaint against a fellow student. His actions directly contributed to the retaliatory actions against the Plaintiff, including his dismissal from the

program. His principal place of business is located at the University of Pennsylvania, 3620 Walnut St, Philadelphia, PA 19104.

16. **Defendant Damon Centola** is the Elihu Katz Professor of Communication, Sociology, and Engineering at the University of Pennsylvania. At the time of the Plaintiff's removal, he was the Chair of the Plaintiff's dissertation committee and a key decision-maker in the comprehensive exam process. He demonstrated negligence and bias in his role, contributing to the Plaintiff's dismissal. His principal place of business is located at the University of Pennsylvania, 3620 Walnut St, Philadelphia, PA 19104.

17. **Defendant Sarah Banet-Weiser** is the current Dean of the Annenberg School for Communication at the University of Pennsylvania. As Dean, she bears responsibility for addressing and rectifying the injustices that occurred under her predecessors. Despite evidence of procedural and substantive errors, she has failed to take corrective action, implicating her in the ongoing harm suffered by the Plaintiff. Her principal place of business is located at the University of Pennsylvania, 3620 Walnut St, Philadelphia, PA 19104.

## IV. FACTUAL BACKGROUND

18. The Plaintiff was enrolled in the doctoral program at the University of Pennsylvania's Annenberg School for Communication.

19. The Plaintiff was dismissed from the program following allegations of failing his comprehensive exams. The Plaintiff contends that these allegations were not supported by clear evidence of his academic performance.

20. The University of Pennsylvania's Graduate Student Handbook outlines specific procedures for comprehensive exams, including fairness and transparency in evaluations. These procedures were not followed in the Plaintiff's case, leading to a biased evaluation

and eventual dismissal. The failure to adhere to these guidelines demonstrates a clear deviation from established policies, contributing to the unjust treatment of the Plaintiff.

21. The Plaintiff requested accommodations for his documented disabilities during critical academic evaluations, including the comprehensive exams. Despite the University's obligation to provide reasonable accommodations as outlined in both the Graduate Student Handbook and the Student Disabilities Services policies, the Plaintiff's requests were either denied or inadequately implemented. This failure to accommodate further disadvantaged the Plaintiff and exacerbated the impact of the biased evaluations.

22. The Defendants engaged in conduct that included:

A. Manipulating exam outcomes to ensure the Plaintiff's failure.

B. Involving faculty members with conflicts of interest in the examination and dismissal process.

C. Retaliating against the Plaintiff for exercising his First Amendment rights by sharing a research article critiquing microaggressions.

D. Creating a hostile environment by allowing and potentially fostering negative perceptions and rumors about the Plaintiff, impacting his reputation and standing within the academic community.

E. The faculty and graduate committee members involved in the aforementioned conduct against the Plaintiff include the following:

1) **John Jackson Jr. (Dean at the time of the Plaintiff's removal):**

o As the dean of the Annenberg School at the time of the Plaintiff's removal, John Jackson Jr. is responsible for overseeing the fairness and integrity of the academic evaluation process. Jackson's failure to intervene or review the committee's decisions, despite clear signs of bias and procedural misconduct,

constitutes a breach of his administrative duties and contributed to the
wrongful actions taken against the Plaintiff. Jackson's principal place of
business is the University of Pennsylvania, 3451 Walnut St, Philadelphia, PA
19104.

2) **Guobin Yang (Associate Dean for Graduate Studies at the time of the**
   **Plaintiff's removal):**

   o   Guobin Yang played a pivotal role in the biased handling of the Plaintiff's
       complaint against a fellow student and exhibited clear favoritism by engaging
       in discussions with the other party before hearing the Plaintiff's side. Yang's
       failure to maintain impartiality and his actions in siding with the complainant
       without due process directly contributed to the retaliatory actions against the
       Plaintiff, including his eventual dismissal from the program. Yang's principal
       place of business is the University of Pennsylvania, 3451 Walnut St,
       Philadelphia, PA 19104.

3) **Damon Centola (Committee Chair at the time of the Plaintiff's removal):**

   o   Damon Centola demonstrated negligence and bias as the Plaintiff's
       dissertation committee chair and a key decision-maker in the comprehensive
       exam process. Centola imposed unrealistic demands and failed to provide the
       necessary guidance and support during critical stages of the Plaintiff's
       academic evaluation, contributing to the unfair dismissal. Centola's actions
       were arbitrary and capricious, deviating from standard academic procedures
       and retaliating for the Plaintiff's requests for accommodations and his
       protected speech under Title IX. Centola's principal place of business is the
       University of Pennsylvania, 3451 Walnut St, Philadelphia, PA 19104.

4) **Sarah Banet-Weiser (Current Dean):**

   o  As the current Dean of the Annenberg School, Sarah Banet-Weiser bears responsibility for addressing and rectifying the injustices that occurred under her predecessors. Banet-Weiser's failure to review or reverse the wrongful actions taken against the Plaintiff, despite evidence of procedural and substantive errors, implicates her in the ongoing harm suffered by the Plaintiff. Banet-Weiser's principal place of business is the University of Pennsylvania, 3451 Walnut St, Philadelphia, PA 19104.

5) **Joanne Murray (Assistant Dean for Graduate Studies):**

   o  Joanne Murray, in her capacity as Assistant Dean for Graduate Studies, failed to provide adequate support and oversight in ensuring that the Plaintiff's complaints and requests for accommodations were handled appropriately. Murray's actions and inactions contributed to the Plaintiff's hostile environment and emotional distress. Specifically, Murray escalated concerns based on unverified claims from the Graduate Student Council without conducting a thorough and impartial investigation, thereby breaching her duty of care owed to the Plaintiff. Murray's principal place of business is the University of Pennsylvania, 3451 Walnut St, Philadelphia, PA 19104.

6) **Sandra González-Bailón (Committee Member at the time of The Plaintiff's removal):**

   o  Sandra González-Bailón, as a member of the Plaintiff's dissertation committee, is implicated in the conflicts of interest that marred the evaluation process. González-Bailón's involvement in the decision-making process raises concerns of bias, given her role on the committee during a period of

8

heightened scrutiny and tension surrounding Plaintiff's academic standing. Her participation, without clear steps to ensure impartiality, contributed to the perception of unfairness and procedural irregularities in the evaluation of Plaintiff. González-Bailón's principal place of business is the University of Pennsylvania, 3451 Walnut St, Philadelphia, PA 19104.

7) **Michael Delli Carpini (Dean and Committee Member at the time of Plaintiff's removal):**

   o  Michael Delli Carpini, serving as both Dean and member of the dissertation committee, failed to exercise his administrative duties to ensure that the Plaintiff's dismissal was based on fair and unbiased academic evaluation. Delli Carpini's prior positive interactions with the Plaintiff, contrasted with his later actions, suggest that external pressures or conflicts influenced his decision-making, leading to a wrongful dismissal. Delli Carpini's principal place of business is the University of Pennsylvania, 3451 Walnut St, Philadelphia, PA 19104.

8) **Diana Mutz (Committee Member):**

   o  Diana Mutz, as a member of the dissertation committee, either failed to adequately participate in or was excluded from the decision-making process, resulting in procedural irregularities that contributed to the Plaintiff's unjust dismissal. Mutz's role in the process raises questions about the integrity of the committee's evaluation. Mutz's principal place of business is the University of Pennsylvania, 3451 Walnut St, Philadelphia, PA 19104.

9) **Yphtach Lelkes (Graduate Studies Committee Member at the time of the Plaintiff's removal):**

- o   Yphtach Lelkes, as a member of the Graduate Studies Committee, participated in the biased evaluation and dismissal of the Plaintiff. Lelkes's involvement in the committee's decision-making process without ensuring due process and fairness contributed to the Plaintiff's wrongful dismissal. Lelkes's principal place of business is the University of Pennsylvania, 3451 Walnut St, Philadelphia, PA 19104.

10) **Jessa Lingel (Graduate Studies Committee Member at the time of the Plaintiff's removal):**

- o   Jessa Lingel's role on the Graduate Studies Committee during the Plaintiff's evaluation was marred by bias and procedural errors. Lingel's participation in the dismissal process without adequately addressing the Plaintiff's concerns or ensuring a fair evaluation process constitutes a breach of her duty to uphold academic standards and fairness. Lingel's principal place of business is the University of Pennsylvania, 3451 Walnut St, Philadelphia, PA 19104.

11) **Julia Ticona (Graduate Studies Committee Member at the time of the Plaintiff's removal):**

- o   Julia Ticona, a member of the Graduate Studies Committee, participated in the biased and procedurally flawed evaluation process that led to the Plaintiff's dismissal. Ticona's actions contributed to the wrongful outcome and the harm suffered by the Plaintiff. Ticona's principal place of business is the University of Pennsylvania, 3451 Walnut St, Philadelphia, PA 19104.

12) **Isabelle Langrock (President of the Student Graduate Council):**

- o   Isabelle Langrock's role as the Graduate Student Council president raises significant concerns, as she failed to properly represent all students, including

the Plaintiff, in a fair manner. Following an incident involving a blatantly racist and sexist email sent to the Plaintiff by Woko, an emergency meeting of the Graduate Council was convened, chaired by Langrock. Subsequently, Langrock, acting on behalf of the entire Graduate Council, sent an email to Murray, Assistant Dean of Graduate Studies, in which she expressed support for Woko's actions. Rather than condemning this behavior as would be expected by any reasonable person, Langrock and the Council endorsed it, thereby failing to address the serious nature of the discriminatory conduct. Langrock is currently a postdoctoral researcher at the Le Centre de Recherche sur les Inégalités Sociales (The Center for Research on Social Inequalities), with her principal place of business located at 1, Place St Thomas d'Aquin, escalier B, 2ème étage - 75007 Paris, France.

13) **Chioma Woko (Graduate Student Council Member - Sent Racist Email):**

o   Chioma Woko's actions in sending a racially charged and hostile email to the Plaintiff, followed by her influence on the Graduate Student Council's negative perception of the Plaintiff, contributed to the discriminatory and retaliatory environment that led to the Plaintiff's dismissal. Woko's conduct is a key example of the hostile environment that the Plaintiff faced at the university. This hostile climate, fostered by Woko's involvement and her role within the Graduate Student Council, directly impacted the decisions made during the Plaintiff's dismissal process. Woko's conduct exemplifies the racially motivated hostility the Plaintiff faced, demonstrating how prejudice and bias were woven into the fabric of the university's actions against him. Woko's continued presence and influence within the academic and social

11

community at Penn added weight to her discriminatory actions. Her involvement as a council member allowed her to propagate these negative perceptions, thereby contributing to the unfair and biased treatment the Plaintiff experienced. Woko is currently a health communication researcher at Meta (formerly Facebook, Inc.), with her principal place of business located at 770 Broadway, New York, NY 10003.

23. The Defendants deviated from established procedures and standards for evaluating comprehensive exams, specifically targeting the Plaintiff. This included:

   A. Subjective and inconsistent grading practices, where the Plaintiff received lower grades than similarly situated peers without adequate explanation.

   B. Failing to provide adequate feedback or allow for appeal of the exam results. Despite multiple requests, the Plaintiff was not given specific reasons for his failing grades nor allowed to review his exam responses.

   C. Failing to follow the university's own policies and procedures for academic evaluation and dismissal.

24. The Plaintiff requested accommodations for his documented disabilities, including extended exam times and breaks. Despite these documented needs, the Defendants failed to provide the necessary accommodations.

25. The University of Pennsylvania's Student Disabilities Services (SDS) initially approved certain accommodations, but these were not effectively implemented during the exams, causing the Plaintiff a significant disadvantage.

26. The Plaintiff's appeals for accommodations were met with resistance and contradictory instructions from Murray and other administrators, further exacerbating his academic challenges.

27. The Plaintiff experienced severe emotional distress, anxiety, and depression as a result of the actions of the Defendants, which were compounded by the failure to provide appropriate accommodations and the creation of a hostile environment.

28. Rumors and negative perceptions spread about the Plaintiff. These rumors and the lack of support from faculty members further contributed to the hostile environment and the adverse actions taken against the Plaintiff.

29. In November 2019, the Plaintiff was involved in the aforementioned email exchange with Woko, during which she sent a racially charged and hostile message to the Plaintiff. This incident was reported to Jackson, but after a January 2020 meeting to discuss the matter, he ceased communication with the Plaintiff. This abrupt cessation of communication raises concerns about possible retaliation or bias against the Plaintiff.

30. In May 2020, following the murder of George Floyd, the university, like many others, experienced heightened sensitivity around issues of race and discrimination. This context may have influenced the handling of the Plaintiff's case, particularly in relation to his interactions with Woko and the Graduate Student Council.

31. In July 2020, Murray stated that they were unsure if the Plaintiff would be returning in the Fall, despite the rarity of a student failing comprehensive exams. This statement indicates that the decision to dismiss the Plaintiff may have been predetermined.

32. In August 2020, the Plaintiff reached an agreement with Student Disabilities Services regarding accommodations for his comprehensive exams, as he was in Japan and unable to take his prescribed medication for his condition. However, Murray and Centola intervened and overruled these accommodations, contributing to the Plaintiff's disadvantage during the exams.

33. In September 2020, the Plaintiff was abruptly removed from the program without prior notice or feedback on his comprehensive exams. When the Plaintiff requested comments on his exams, Delli Carpini and González-Bailón took several days to provide them, giving the impression that they might not have thoroughly reviewed the exams. Centola also delayed providing his comments, further raising concerns about the integrity of the evaluation process.

34. The removal of the Plaintiff from the program required the approval of the Graduate Studies Committee. However, one member of the committee was out of the country and unaware of the Plaintiff's removal, making it implausible that the committee had adequately reviewed all six of the Plaintiff's comprehensive exam questions during the height of the COVID-19 pandemic.

35. During email exchanges following the exams, the Plaintiff attempted to work directly with Centola, believing him to be the primary decision-maker. However, Centola deflected responsibility to Murray, suggesting that the decision to dismiss the Plaintiff may not have been entirely his and that he was attempting to distance himself from the issue.

36. According to university policy, all faculty members should have had access to the Plaintiff's comprehensive exams in the following academic year. However, none of the faculty had seen his exams, further indicating a lack of transparency and fairness in the evaluation process.

## V. CAUSAL CONNECTION BETWEEN THE PLAINTIFF'S PROTECTED ACTIVITY AND THE DEFENDANTS' ADVERSE ACTIONS

**Americans with Disabilities Act (ADA)**

37. The Plaintiff's requests for accommodations for his disabilities, a protected activity under the ADA, were met with resistance and led to adverse actions, including the failure to provide necessary accommodations during exams and his dismissal from the program.

38. The adverse actions, including manipulating exam outcomes and involving biased faculty members, occurred after the Plaintiff's requests for accommodations, indicating a retaliatory motive.

**Title IX of the Education Amendments of 1972**

39. The Plaintiff engaged in protected activity under Title IX by sharing a research article critiquing microaggressions. This led to negative comments, biased evaluations, and eventual dismissal from the program.

40. The adverse actions taken against the Plaintiff, including biased evaluations and dismissal, followed closely after his protected activity, suggesting retaliation.

**TIMELINESS OF CLAIMS**

41. The Plaintiff's claims are timely filed within the applicable statute of limitations periods for the ADA, Title IX, Title VI, and other relevant federal and state laws.

42. The continuous nature of the discriminatory and retaliatory actions, along with the ongoing adverse impacts on the Plaintiff's academic and personal life, supports the timeliness of the claims.

43. The discovery rule and equitable tolling doctrines may also apply, given the Defendants' efforts to conceal their discriminatory and retaliatory motives and the resulting delays in the Plaintiff discovering the full extent of the harm caused.

**VII. DAMAGES**

44. As a result of the Defendants' actions, the Plaintiff has suffered significant financial losses, including the cost of tuition, loss of earnings related to being deprived of a doctorate, and damage to his academic and personal reputation.

45. The Plaintiff also experienced severe emotional distress, anxiety, and depression, exacerbated by the Defendants' actions and their failure to accommodate his disabilities.

## VIII. CLAIMS FOR RELIEF

## COUNT I: VIOLATIONS OF THE AMERICANS WITH DISABILITIES ACT (ADA)

46. The Plaintiff realleges and incorporates by reference all preceding paragraphs.

47. The Defendants, the Trustees of the University of Pennsylvania, John Jackson Jr., Guobin Yang, Damon Centola, and Sarah Banet-Weiser, failed to provide reasonable accommodations for the Plaintiff's disabilities, as outlined in the University's Graduate Student Handbook and related policies, in violation of the ADA. The University's failure to follow its own procedures exacerbated the Plaintiff's disadvantage during critical academic evaluations, leading to his wrongful dismissal.

48. As a direct and proximate result of the Defendants' actions, the Plaintiff suffered significant financial losses, damage to his academic and personal reputation, and severe emotional distress.

## COUNT II: RETALIATION UNDER THE AMERICANS WITH DISABILITIES ACT (ADA)

49. The Plaintiff realleges and incorporates by reference all preceding paragraphs.

50. The Defendants, the Trustees of the University of Pennsylvania, John Jackson Jr., Guobin Yang, Damon Centola, and Sarah Banet-Weiser, retaliated against the Plaintiff for requesting accommodations for his disabilities, a protected activity under the ADA. The retaliatory actions included the denial of accommodations during the comprehensive

exams, contrary to the policies outlined in the Graduate Student Handbook, and biased evaluations influenced by conflicts of interest.

51. As a direct and proximate result of the Defendants' retaliatory actions, the Plaintiff suffered significant financial losses, damage to his academic and personal reputation, and severe emotional distress.

**COUNT III: VIOLATIONS OF TITLE IX OF THE EDUCATION AMENDMENTS OF 1972**

52. The Plaintiff realleges and incorporates by reference all preceding paragraphs.

53. The Plaintiff engaged in protected activity under Title IX by sharing a research article critiquing microaggressions.

54. Following this protected activity, as outlined in the University's Graduate Student Handbook, the Plaintiff experienced adverse actions, including, but not limited to, receiving biased evaluations from faculty members and facing a hostile environment, which culminated in his dismissal from the doctoral program.

55. The adverse actions taken against the Plaintiff were temporally proximate to his engagement in the protected activity. Faculty members demonstrated a pattern of retaliatory behavior, such as lowering grades without adequate explanation and providing hostile responses to the Plaintiff's academic work.

56. As a direct and proximate result of the Defendants' actions, the Plaintiff suffered significant financial losses, damage to his academic and personal reputation, and severe emotional distress.

**COUNT IV: RETALIATION UNDER TITLE IX OF THE EDUCATION AMENDMENTS OF 1972**

57. The Plaintiff realleges and incorporates by reference all preceding paragraphs.

58. The Plaintiff was retaliated against for engaging in protected speech under Title IX, specifically for critiquing microaggressions and discussing issues related to sex and gender discrimination.

59. The retaliation included biased evaluations, negative comments, hostile treatment by faculty members, and his wrongful dismissal from the program. This adverse treatment directly followed the Plaintiff's protected activity, establishing a clear causal connection.

60. As a direct and proximate result of the Defendants' retaliatory actions, the Plaintiff suffered significant financial losses, damage to his academic and personal reputation, and severe emotional distress.

## COUNT V: VIOLATIONS OF TITLE VI OF THE CIVIL RIGHTS ACT OF 1964

61. Plaintiff realleges and incorporates by reference all preceding paragraphs.

62. The Defendants discriminated against the Plaintiff based on his race, in violation of Title VI, by creating a hostile academic environment and wrongfully dismissing him from the program.

63. As a direct and proximate result of the Defendants' actions, the Plaintiff suffered significant financial losses, damage to his academic and personal reputation, and severe emotional distress.

## COUNT VI: VIOLATIONS OF 42 U.S.C. § 1981

64. The Plaintiff realleges and incorporates by reference all preceding paragraphs.

65. The Defendants' actions constituted intentional racial discrimination, depriving the Plaintiff of the right to make and enforce contracts and to the full and equal benefit of all laws, in violation of 42 U.S.C. § 1981.

66. As a direct and proximate result of the Defendants' discriminatory actions, the Plaintiff suffered significant financial losses, damage to his academic and personal reputation, and severe emotional distress.

## COUNT VII: BREACH OF CONTRACT UNDER PENNSYLVANIA COMMON LAW

67. The Plaintiff realleges and incorporates by reference all preceding paragraphs.

68. The Defendants, the Trustees of the University of Pennsylvania, entered into contractual agreements with the Plaintiff, including the Student Handbook and other policies and procedures that form a part of the educational contract between the institution and its students.

69. The Defendants breached these contractual obligations by failing to provide the promised accommodations, failing to follow established academic procedures, and wrongfully dismissing the Plaintiff from the doctoral program.

70. As a direct and proximate result of the Defendants' breach, the Plaintiff suffered significant financial losses, damage to his academic and personal reputation, and severe emotional distress.

## COUNT VIII: NEGLIGENT SUPERVISION UNDER PENNSYLVANIA COMMON LAW

71. The Plaintiff realleges and incorporates by reference all preceding paragraphs.

72. The Defendants owed a duty to the Plaintiff to supervise its faculty and administrative staff to prevent discriminatory, retaliatory, and harmful conduct.

73. The Defendants breached this duty by failing to exercise reasonable care in supervising its employees, allowing them to engage in discriminatory, retaliatory, and harmful actions against the Plaintiff.

74. As a direct and proximate result of the Defendants' negligent supervision, the Plaintiff suffered significant financial losses, damage to his academic and personal reputation, and severe emotional distress.

**COUNT IX: INTENTIONAL INFLICTION OF EMOTIONAL DISTRESS (IIED) UNDER PENNSYLVANIA LAW**

75. The Plaintiff realleges and incorporates by reference all preceding paragraphs.

76. The Defendants' conduct was extreme and outrageous, intentionally or recklessly causing severe emotional distress to the Plaintiff.

77. Under Pennsylvania law, to establish a claim for IIED, a plaintiff must demonstrate that the conduct was so outrageous in character and so extreme in degree as to go beyond all possible bounds of decency (Hoy v. Angelone, 554 Pa. 134, 720 A.2d 745 (1998); Papieves v. Lawrence, 437 Pa. 373, 263 A.2d 118 (1970)).

78. The Defendants' actions in manipulating academic outcomes, involving faculty members with conflicts of interest, retaliating against the Plaintiff for protected speech, creating a hostile environment, and failing to accommodate his disabilities were extreme and outrageous, intended to cause, or done with reckless disregard of the probability of causing severe emotional distress. Comments from faculty members and the spread of rumors by classmates contributed to this distress.

79. The Plaintiff suffered severe emotional distress as a result of the Defendants' conduct, experiencing symptoms such as severe anxiety, depression, and loss of sleep, which required psychological treatment.

**COUNT X: NEGLIGENT INFLICTION OF EMOTIONAL DISTRESS (NIED) UNDER PENNSYLVANIA LAW**

80. The Plaintiff realleges and incorporates by reference all preceding paragraphs.

81. The Defendants owed a duty of care to the Plaintiff as his mentors and supervisors.

82. Under Pennsylvania law, a claim for NIED can be established in situations where the defendant had a contractual or fiduciary duty toward the plaintiff or where the plaintiff suffered immediate and substantial physical harm as a result of the emotional distress (Love v. Cramer, 606 A.2d 1175 (Pa. Super. Ct. 1992); Brown v. Philadelphia College of Osteopathic Medicine, 674 A.2d 1130 (Pa. Super. Ct. 1996)).

83. The Defendants breached this duty by engaging in negligent conduct that caused the Plaintiff severe emotional distress, resulting in physical manifestations such as severe anxiety, depression, and loss of sleep.

## IX. JURY TRIAL DEMAND

The Plaintiff demands a trial by jury on all issues so triable.

## X. PRAYER FOR RELIEF

WHEREFORE, The Plaintiff prays for judgment against the Defendants as follows:

1. For a declaratory judgment that the Defendants' actions violated the Plaintiff's rights under the ADA, Title IX, Title VI, 42 U.S.C. § 1981, Section 504 of the Rehabilitation Act, and Pennsylvania state law.

2. For injunctive relief requiring the Defendants to reinstate the Plaintiff to the doctoral program at the University of Pennsylvania's Annenberg School for Communication with appropriate accommodations for his disabilities.

3. For compensatory damages, including, but not limited to, the cost of tuition, loss of earnings, and damage to the Plaintiff's academic and personal reputation.

4. For damages for emotional distress, anxiety, and depression caused by the Defendants' discriminatory and retaliatory actions.

5. For punitive damages in an amount to be determined at trial.

6. For reasonable attorneys' fees, costs, and expenses incurred in bringing this action.

7. For such other and further relief as the Court deems just and proper.

Dated: August, 26 2024                                    Respectfully submitted,

By: _____

Eric Forbush, *Pro Se*
248 Liberty Square Road
Boxborough, Massachusetts 01719